UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

FORT MYERS DIVISION

**THOMAS  CARLIN,**

Plaintiff,

-vs-                                                              Case No.:_____

**JARAD ANDERSON,**

**JOHN DOE and JANE DOE,**

Defendants,

## CIVIL RIGHTS COMPLAINT

Plaintiff, Thomas Carlin, in proper person, sues Defendant, Jarad Anderson, and states as follows:

## NATURE OF THE ACTION

1.     This is a civil rights action brought in proper person by Plaintiff Carlin, against Defendant, Jarad Anderson, (hereinafter "Defendant Anderson" or "Anderson") for damages pursuant to title **42 U.S.C. § 1983.**

2.     Defendant Anderson took it upon himself to disconnect (without due process of law — in violation of Recovery Solutions Policy PRG-12 (Appendix-A)) the Smart Communications Tablets apps: ability to send and receive messages; receive visitations; and receive visits on demand, while Plaintiff Carlin is housed in the (*non-punitive*) Special Management Units that are used for Wing Restriction and Secure Management.

3.     At all times relevant Defendant Anderson, also took it upon himself to restrict access to the Smart Communications Tablets by providing seven (7) Smart Communications Tablets for forty-eighth (48) residents in each General Population Housing Unit and three (3) Smart Communications Tablets for thirty (30) residents

in each Special Management Unit; thus unfairly restricting Plaintiff Carlin's access to the Smart Communications Tablets to view his routine mail and legal mail that's in the Smart Communications Tablets; and to communicate with his family, friends, and associates.

4.    The actions of Defendant Anderson were unnecessary because there is no security need for a restriction or for a block of communications | right of association between Plaintiff Carlin and his family, friends, and associates and the restriction is not being individualized nor applied for a security breach or for a justified security reason.

5.    In addition, the General Population Dormitories charging stations have the ability to hold twenty (20) Smart Communications Tablets as opposed to seven (7); as well as the Special Management Units charging stations have the ability to hold ten (10) Smart Communications Tablets as opposed to three (3); so the shortage of Smart Communications Tablets is unreasoned and not unjustified since the former routine mail procedures were circumvented by the electronic devices; as demonstrated by DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO THIS COURT'S JULY 9 ORDER of **Vega v. Masters** 2:21-CV-771-JLB-NPM and the SUPPLEMENTAL ORDER.

6.    Also the Florida Departments of Corrections that's penal and punitive supplies one (1) Tablet per Inmate which demonstrates that Defendant Anderson's constraint on the Smart Communications Tablets is unjustified.

## JURISDICTION AND VENUE

7.    This action arises under the 1st & 14th **Amendments to the United States Constitution**; title **42 U.S.C. §§ 1983 & 1988**; and title **28 U.S.C. § 1367 (a).**

8.    Jurisdiction of this Court is invoked pursuant to title **28 U.S.C. §§ 1331 & 1343.**

9.    Venue properly lies in the United States District Court for the Middle District of Florida (Fort Myers Division) pursuant to title **28 U.S.C. §1391**, insofar

as the events giving rise to this action took place in Desoto County Florida and Desoto County Florida is located within this federal judicial district.

## JURY TRIAL DEMAND

**10.**    Plaintiff Carlin respectfully demands a trial by jury on all issues in this matter pursuant to **Fed. R. Civ. P. 38 (b).**

**11.**    Plaintiff Carlin is open to the **Civil Justice Reform Act** of 1990 which is a District Courts' concept of an **Alternative Dispute Resolution** (known as "**ADR**").

## PARTIES

**12.**    Plaintiff Thomas Carlin is a citizen of the United States and currently resides at the Florida Civil Commitment Center which is for forensic psychiatric treatment, located in Desoto County, Florida.

**13.**    At the time of the incidents alleged herein, he was in the custody of the Florida Department of Children and Families and was detained at the Florida Civil Commitment Center in Desoto County, Florida pursuant to **Chapter 394., Part V, of the Florida Statutes**, as a mental health patient.

**14.**    Plaintiff Carlin's address is: Florida Civil Commitment Center, 13619 S.E. Hwy 70, Arcadia, FL 34266.

**15.**    Defendant Anderson is a citizen of the United States.

**16.**    Defendant Anderson is Administrator at the Florida Civil Commitment Center, acting in the capacity of agent, servant, and employee of Recovery Solutions, Inc., and the Florida Department of Children and Families, within the scope of his employment, and acted under color of state law.

**17.**    Defendant Anderson is being sued in his individual and official capacity.

**18.**    Defendant Anderson's address is: Florida Civil Commitment Center, 13619 S.E. Hwy 70, Arcadia, FL 34266.

## STATEMENT OF FACTS

19.    Plaintiff Carlin is visually impaired and cannot see the words on the screen of the Smart Communications Tablet and thus cannot get access to his mail.

20.    Plaintiff Carlin qualifies for vision impairment and hearing impairment under the American Disability Act.

21.    Plaintiff Carlin cannot navigate through the Smart Communications Tablet because he cannot see the words on the screen.

22.    In addition, Plaintiff Carlin cannot view his mail because there are insufficient Smart Communications Tablet for general resident use.

23.    Also the Smart Communications Tablet is being manipulated by a small number of residents.

24.    The only time that Plaintiff Carlin has been able to secure a Smart Communications Tablet is by locating residents that are harboring them and asking them for permission to use them which is seldom granted by them.

25.    In the past six (6) months Plaintiff Carlin has not seen a Smart Communications Tablet at the charging station and each time he sees one it has a note "Do Not Touch Or Remove."

26.    Plaintiff Carlin has no possible way of making paper copies of the routine mail if its mailed to him in the Smart Communications Tablet.

27.    Plaintiff Carlin currently resides in a unit that houses up to forty-eight (48) men and the housing unit only has six (7) Smart Communications Tablets.

28.    Plaintiff Carlin is a ward of the State of Florida and is civilly committed for long term care and mental health treatment under the Involuntary Civil Commitment Sexually Violent Predator Act; wherefore his rights are governed by **Chapter 394., Part V, of the Florida Statutes**; the **United States Mental Health Bill of Rights**; and the **United States Constitution**.

## FIRST CLAIM FOR RELIEF

**(Title 42 U.S.C. § 1983 and 1ST & 14th AMENDMENTS INFRINGEMENTS OF RIGHTS OF ASSOCIATION)**

**42**    Plaintiff Carlin repeats and re-alleges the foregoing paragraphs as if the same were fully set forth herein.

**43**    At all times relevant to the above captioned numbered case the facility Administrator (Anderson) took it upon himself to disconnect (***without due process of law which violates Recovery Solutions Policy PRG-12***) the Smart Communications Tablets app: ability to send and receive messages, receive visitations, and visits on demand while Plaintiff Carlin is housed in the (*alleged non-punitive*) Special Management Units, utilized for Wing Restriction and Secure Management, resulting in a violation of the 1st &14th **Amendments to the United States Constitution.**

## SECOND CLAIM FOR RELIEF

**(Title 42 U.S.C. § 1983 and 1ST & 14th AMENDMENTS INFRINGEMENTS OF RIGHTS OF ASSOCIATION)**

**44**    Plaintiff Carlin repeats and re-alleges the foregoing paragraphs as if the same were fully set forth herein.

**45**    At all times relevant to the above numbered captioned case the facility Administrator (Anderson) took it upon himself to unjustly restrict access to the Smart Communications Tablets by providing seven (7) Smart Communications Tablets for forty-eight (48) residents in each General Population Housing Unit and three (3) Smart Communications Tablets for thirty (30) residents in each Special Management Unit resulting in a violation of the 1st &14th **Amendments to the United States Constitution** by unjustly and without cause restricting Carlin's access to a Smart Communications Tablet to view his routine mail and legal mail

that's in the Smart Communications Tablet and to communicate with family, friends, and associates.

## THIRD CLAIM FOR RELIEF

### (Title 42 U.S.C. § 1983 and 1ST & 14th AMENDMENTS INFRINGEMENTS OF RIGHTS OF ASSOCIATION)

46    Plaintiff Carlin repeats and re-alleges the foregoing paragraphs as if the same were fully set forth herein.

47    The actions of Defendant Anderson were unnecessary and violated the 1st &14th Amendments to the United States Constitution because there is no security need for a restriction or block of communication | right of association between Plaintiff Carlin and his family, friends, and associates and the restriction is not being individualized nor applied for a security breach or justified security reason.

## FOURTH CLAIM FOR RELIEF

### (Title 42 U.S.C. § 1983 and 1ST & 14th AMENDMENTS INFRINGEMENTS OF RIGHTS OF ASSOCIATION)

48    Plaintiff Carlin repeats and re-alleges the foregoing paragraphs as if the same were fully set forth herein.

49    In addition, the general population dormitory charging stations have the ability to hold twenty (20) Smart Communications Tablets as opposed to seven (7), as well as the Special Management Units charging stations have the ability to hold ten (10) Smart Communications Tablets as opposed to three (3), so the shortage of Smart Communications Tablets is not reasonably or equitably justified since the former mail procedures were circumvented by the electronic device as evinced by DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO THIS COURT'S JULY 9 ORDER of

**Carlin v. Masters** 2:21-CV-771-JLB-NPM and the SUPPLEMENTAL ORDER so there is a validated constitutional violation occurring in the case sub judice.

## FIFTH CLAIM FOR RELIEF

**(Title 42 U.S.C. § 1983 and 1ST & 14th AMENDMENTS INFRINGEMENTS OF RIGHTS OF ASSOCIATION)**

**50**    Plaintiff Carlin repeats and re-alleges the foregoing paragraphs as if the same were fully set forth herein.

**51**    Plaintiff Carlin is visually impaired and cannot see the words on the screen of the Smart Communications Tablet and thus cannot get access to his mail.

**52**    Plaintiff Carlin qualifies for vision impairment and hearing impairment under the American Disability Act.

**53**    Plaintiff Carlin cannot navigate through the Smart Communications Tablet because he cannot see the words on the screen.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Carlin prays for judgment against Defendant Anderson as follows:

**54**    Compensatory and punitive damages up to $250,000.00 or a justifiable amount to be proven at the trial;

**55**    Reasonable attorney's fees and costs pursuant to title **42 U.S.C. § 1988**; title **42 U.S.C. § 12205**; and title **29 U.S.C. § 794 a (b)**, and as otherwise authorized by statute or law.

**56**    The appointment of Counsel because Carlin is a mental health patient pursuant to **Chapter 394., Part V, of the Florida Statutes** (single subject rule) and has been diagnosed as having a Mental Abnormality and Personality Disorder which binds him to the Professional Judgment Standards comprised of the Mental Health Bill of Rights, the American Disability Act, and the Rehabilitation Act so it's

the duty of this Court by these Congressional Acts to protect the rights of persons that have been diagnosed as mentally ill whom cannot adequately represent themselves.

57     A judicial order directing Defendant Anderson to connect the Smart Communications apps for messages, visitations, demand visits in the Special Management Units and to fill the charging stations in the Special Management Units and the General Population with the maximum capacity of Smart Communication Tablets (respectively ten (10) Smart Communication Tablets in Lakes; ten (10) Smart Communication Tablets in Oceans; and twenty (20) Smart Communication Tablets in each General Population charging station.) And to install a Kiosk system for the visually impaired in every dormitory so that they may read the mail that's inserted in the Smart Communications Tablet.

## VERIFICATION OF DOCUMENT

**STATE OF FLORIDA**

**COUNTY OF DESOTO**

58     I DECLARE (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. **Title 28 U.S.C § 1746.**

Executed on: **April 29, 2025**

Respectfully submitted

*Carlin, Thomas*

Thomas Carlin

Resident Number 990211

Florida Civil Commitment Center

13619 S.E. Hwy 70

Arcadia, FL 34266

## CERTIFICATE OF SERVICE

54.    Pursuant to standing order of  Case No.: 2:21-mc-22-FtM-SPC at ¶2: "Upon receiving an email from the FCCC designated individual, the Court's Clerk Office will electronically upload the document(s) and exhibits/attachments to the Case Management and Electronic Case Filing (CM/ECF) system. For any uploaded document (other than a complaint, which requires service of process), the Notice of Electronic Filing (NEF) generated by CM/ECF system will constitute official service upon and notice to the other parties in the case, if counsel for the other parties are registered in the Court's electronic filing system. For those not registered, the Clerk of Court will mail a copy of the uploaded documents on the detainee's behalf via United States Postal Service.

Thomas Carlin

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

THOMAS CARLIN,

Plaintiff,

-vs-                                              Case No.:_____

JARAD ANDERSON,

JOHN DOE and JANE DOE,

Defendants,


## TABLE OF APPENDIX

Recovery Solution Policy PRG-12.......................................................APPENDIX-A

# APPENDIX-A



| TITLE: PRG-12 LIMITING AND SUSPENDING PRIVILEGES | PAGE: | 1 OF 5 |
|---|---|---|
| CATEGORY:  PROGRAMS (PRG) | VERSION: | 8 |
| APPROVER: Donald Sawyer (Facility Administrator), Genna Brisson (VP Operations) | SUPERSEDES:  08/14/2017<br>EFFECTIVE:    05/18/2020<br>REVIEWED:     05/18/2020 | |

## 1. PURPOSE

It is the purpose of this policy to limit or suspend privileges for residents who exhibit inappropriate or threatening behavior.

## 2. SCOPE

This policy provides guidelines for the application and removal of resident privileges.

## 3. POLICY

It is the policy of the Florida Civil Commitment Center to implement restrictions on or suspension of resident privileges in response to behavior that poses a danger to self, others, or property, or that is a threat to the security of the facility.

## 4. INTERPRETATION

The Behavior Management Committee is responsible for the proper interpretation of this policy.

## 5. PROCEDURE

5.1.    Staff may impose an immediate temporary restriction or suspension of privilege if it is reasonably related to specific misbehavior by a resident.

5.2.    A more permanent restriction or suspension of privilege may be imposed only after a behavior management hearing is conducted by the Behavior Management Committee.

5.3.    Residents who are reclassified to Secure Management status will be assessed daily by clinical staff. The clinician completing the daily rounds will document in the Health Record their observations of each restricted resident.

5.4.    Restrictions and/or suspensions of privileges shall be individualized to person and circumstance. Although not exclusive, the following types of restrictions or suspensions may be either temporarily or more permanently imposed:

- Activity Restriction: The resident may participate in the designated activity only when escorted or monitored.

- Activity Suspension: The resident will not be allowed to participate in the designated activity for the duration of the suspension.

- Visitation Restriction: Specific restriction is placed upon visitation in relation to time and/or persons.

- Visitation Suspension: Visitation is totally suspended for the duration of the suspension.

CONFIDENTIAL AND PROPRIETARY INFORMATION OF WELLPATH RECOVERY SOLUTIONS, LLC

| ≡ **wellpath**™ RECOVERY SOLUTIONS | FLORIDA CIVIL COMMITMENT CENTER POLICY AND PROCEDURE MANUAL | |
|---|---|---|
| TITLE: PRG-12 LIMITING AND SUSPENDING PRIVILEGES | PAGE: | 2 OF 5 |
| CATEGORY:  PROGRAMS (PRG) | VERSION: | 8 |
| APPROVER: Donald Sawyer (Facility Administrator), Genna Brisson (VP Operations) | SUPERSEDES: 08/14/2017 EFFECTIVE:   05/18/2020 REVIEWED:    05/18/2020 | |

- Movement Restriction: Specific restriction is placed upon movement in relation to accessing public areas of the facility.

- Canteen Restrictions: Specific restriction is placed upon the amount of allowable canteen items.

- Package Restrictions:  Specific restriction is placed upon the amount of allowable packages.

## 6.  DEFINITIONS

6.1.  <u>Behavior Management Hearing</u> - The procedure used to provide administrative due process requirements for residents charged with violating facility rules.

6.2.  <u>Disciplinary Report</u> - The form used by staff to document a rule violation by a resident.

6.3.  <u>Behavior Management Committee</u> - A team made up of at least three impartial staff members with representation from the security and clinical departments. The Committee will be responsible for conducting behavior management hearings on Disciplinary Reports.  Since a Behavior Management Committee is comprised of security and clinical staff, it is anticipated that decisions made by the Behavior Management Committee may provide direction or otherwise positively affect other treatment plans within the facility.  The Behavior Management Committee will determine whether therapeutic intervention is necessary and what range of consequences shall be applied.  The Behavior Management Committee may reassign a resident to a different level of programming, or management status, depending upon the behavior displayed during each act of misconduct.

6.4.  <u>Facility Investigator</u> - The staff member assigned to review Disciplinary Reports, investigate rule violations, interview the charged resident, and gather evidence relevant to the violation.

6.5.  <u>Wing Restriction Status</u>   Wing Restriction Housing is a form of separation from the general population which may involve the resident being housed in a designated high risk unit where residents who commit serious or repeated rule violations are placed for specific periods of time according to policy by the Behavior Management Committee. Wing Restriction Housing is an action imposed only when the Behavior Management Committee determines no other action is appropriate to adequately achieve the deterrence necessary to correct a resident's behavior, or when previous progressive actions have been unsuccessful in motivating a resident to correct his behavior. Residents who are housed on Wing Restriction have access to their personal property commensurate with a C.A.R.E. Level 2.  Residents who are housed

CONFIDENTIAL AND PROPRIETARY INFORMATION OF WELLPATH RECOVERY SOLUTIONS, LLC



| | FLORIDA CIVIL COMMITMENT CENTER POLICY AND PROCEDURE MANUAL | | |
|---|---|---|---|
| TITLE: PRG-12 LIMITING AND SUSPENDING PRIVILEGES | | PAGE: | 3 OF 5 |
| CATEGORY:  PROGRAMS (PRG) | | VERSION: | 8 |
| APPROVER: Donald Sawyer (Facility Administrator), Genna Brisson (VP Operations) | | SUPERSEDES: EFFECTIVE: REVIEWED: | 08/14/2017 05/18/2020 05/18/2020 |

on Wing Restriction have access to mental health, medical, recreational, religious, and clinical programming activities if they so choose insofar as the resident participating has not been evaluated as being an imminent threat to self or others, or compromises the security of the facility. At times, Wing Restriction may be used by a Shift Supervisor to temporarily remove a resident from their assigned living unit only after an allegation of a major rule violation until the Behavior Management Committee may convene to consider the charges. Wing restriction may also occur on the resident's usual housing unit when appropriate and feasible.

6.6.    <u>Major Violation</u> - Any rule violation that includes serious behavior that places, or threatens, another individual with imminent danger or compromises the safety or security of the facility.

6.7.    <u>Minor Violation</u> - Any violation of institution rules that does not place another individual in imminent danger.

6.8.    <u>Management Status</u> - There is a five-level resident behavior management system in the facility, through which residents may progress, depending upon their involvement in or avoidance of misconduct.  This Behavior Management System is known as the C.A.R.E. System (Consequences, Alternatives, Responsibility and Encouragement). Each status corresponds to the associated privileges. Residents will be assigned to a C.A.R.E. status based upon their need for structure and support and demonstrated behavior at the facility. The system will be designed to afford residents greater privileges and incentives for positive behavior. Each C.A.R.E. status will have its own structure, responsibilities, privileges and incentives. These levels include:
- Level 5:  Communal Status (Highest level of privileges)
- Level 4:  Social Status
- Level 3:  Intermediate Status
- Level 2:  Wing Restriction Status
- Level 1:  Secure Management Status (Lowest level of privileges)

6.9.    <u>Communal Status – C.A.R.E. Level 5:</u>  Residents who are in compliance with all aspects of facility life and maintain good behavior for a minimum of six (6) consecutive months are afforded the highest level of privileges on this status. If a resident is found by the Behavior Management Committee to have committed one rule violation at any time while in this status or three minor violations within a six month period, they may be moved back to any other level, depending on the severity of the infraction.

6.10.    <u>Social Status – C.A.R.E. Level 4:</u>  Newly admitted residents arriving to the facility will be assigned to this status after completing admission and orientation processing. Residents who maintain positive behavior during this status for six (6) consecutive months will advance to Communal Status. Failing to maintain positive behavior may result in a resident being moved back to a lower status.

CONFIDENTIAL AND PROPRIETARY INFORMATION OF WELLPATH RECOVERY SOLUTIONS, LLC

| ⚛ **wellpath**<br>RECOVERY SOLUTIONS | **FLORIDA CIVIL COMMITMENT CENTER**<br>**POLICY AND PROCEDURE MANUAL** | |
|---|---|---|
| TITLE: PRG-12 LIMITING AND SUSPENDING PRIVILEGES | PAGE: | 4 OF 5 |
| CATEGORY: PROGRAMS (PRG) | VERSION: | 8 |
| APPROVER: Donald Sawyer (Facility Administrator), Genna Brisson (VP Operations) | SUPERSEDES: 08/14/2017<br>EFFECTIVE: 05/18/2020<br>REVIEWED: 05/18/2020 | |

6.11.  <u>Intermediate Status – C.A.R.E. Level 3:</u>  Residents assigned to Communal or Social Status who cannot maintain positive behavior will decrease to Intermediate Status.  Residents who remain in Intermediate Status for six months without a major violation or three minor violations will advance to Social Status  If a resident is found by the Behavior Management Committee to have committed one major rule violation or three minor violations within a six month period during this status, the resident may be moved back to Wing Restriction Status or restart the six-month period depending on the severity of the violation and whether the violation poses an imminent threat to others or compromises the security of the facility.

6.12.  <u>Wing Restriction Status – C.A.R.E. Level 2:</u>  Residents will be assigned to Wing Restriction Status when released from Secure Management Status, or when their behavior warrants they be restricted from movement off their respective living unit after a major rule violation or three minor rule violations occur while on Intermediate Status. Residents may be kept on Wing Restriction Status for up to 90 days for the initial placement. Continued facility rule violations may result up to an additional 90 days on Wing Restriction from the last incident. This status permits resident interaction within the housing unit. Movement out of the housing unit for leisure activities will be restricted. Privileges are significantly restricted on this status. Services that will be available to residents on Wing Restriction Status include being provided food that is the same as that provided to the general population, access to a nurse or physician to screen requests for medical attention, access to a chaplain when a chaplain is present in the facility, weekly contact by a member of the treatment team, continued involvement in clinical programs when there is a therapeutic benefit, there is no threat of imminent danger to others, and the security of the facility is not compromised (as approved by the Clinical Director or designee), and freedom of movement within the housing unit.

Wing restriction may be used by a Shift Supervisor to temporarily remove a resident from their assigned living unit after an allegation of a major rule violation until the Behavior Management Committee may convene to consider the charges.

6.13.  <u>Secure Management Status – C.A.R.E. Level 1 :</u>  Secure Management is not used as punishment; rather, it is a temporary housing assignment for residents who pose an imminent risk to others or who have compromised the safety and security of the facility. Residents who are placed in Secure Management will be evaluated by nursing staff prior to placement. The evaluation will be documented on the *Physical and Mental Health Assessment Form* (CL-10D) and placed in the Health Record. If the assessment by the nurse or clinician indicates an underlying mental health issue contributed to the behavior, the psychiatrist will be called to assess the need for an emergency treatment order or possible placement in the inpatient mental health unit.

A shift supervisor who becomes aware of an incident or situation that he or she believes warrants the immediate assignment of a resident to this status may initiate such placement.

CONFIDENTIAL AND PROPRIETARY INFORMATION OF WELLPATH RECOVERY SOLUTIONS, LLC

| ⚜ **wellpath**<br>RECOVERY SOLUTIONS | FLORIDA CIVIL COMMITMENT CENTER<br>POLICY AND PROCEDURE MANUAL | |
|---|---|---|
| TITLE: PRG-12 LIMITING AND SUSPENDING PRIVILEGES | PAGE: | 5 OF 5 |
| CATEGORY:  PROGRAMS (PRG) | VERSION: | 8 |
| APPROVER: Donald Sawyer (Facility Administrator), Genna Brisson (VP Operations) | SUPERSEDES: 08/14/2017<br>EFFECTIVE: 05/18/2020<br>REVIEWED: 05/18/2020 | |

The recommendation to place a resident in Secure Management Status will be reviewed by an Administrator on Call within one hour of such placement. The Administrator may continue or deny the placement after a review of the circumstances.  If the Administrator agrees with the placement, the resident will remain on Secure Management Status until the Behavior Management Committee makes a determination that the resident's behavior is no longer an imminent threat. Residents will remain on this status as long as they continue to pose a serious risk to other residents and/or staff. The Behavior Management Committee shall review resident's placement in Secure Management within three (3) business days of the initial placement to assess the resident's level of dangerousness. Dependent on the risk, the committee will make a determination as to whether release or continued placement is necessary. If serious risk is determined and continued placement is required, the Behavior Management Committee will again review the placement and subsequently assess risk every seven days thereafter until resident behavior has stabilized and risk has subsided enough to warrant release.

The Behavior Management process is not suspended during this time and will follow the normal time frames as outlined below. Residents who have been screened by clinical staff and determined to be Recovery (R) Grade 4 are at no time to be placed in Secure Management.

Personal property and privileges while in this status will be significantly limited for safety and security reasons. Services that will be available to residents in this status include being provided food that is the same as that provided to the general population during comparable meal-time hours, access to a nurse or physician to screen requests for medical attention, access to a chaplain when a chaplain is present in the facility, daily contact by a member of the clinical treatment team, and one hour of exercise out of the assigned room each day.

6.14.  <u>Admission Status:</u>  Given the temporary nature of Admission Status, no correlating C.A.R.E. number is associated with this status.  Residents will be typically assigned to Admission Status upon arrival at the facility.   Residents may be restricted to their assigned room for the first 72 hours in order to have medical, clinical, and security assessments completed.  While in Admission Status, residents may be restricted to their housing or living unit for up to one week as they begin to learn about the facility's rules and routines.  After completion of the admission assessments and orientation to the facility, residents are advanced to Social Status.  Admission status residents may be housed in private rooms or on the same unit(s) as Social or Communal status residents in order to positively influence their perception and engagement in the Sex Offender Treatment Program.

# 7.  REFERENCES

CONFIDENTIAL AND PROPRIETARY INFORMATION OF WELLPATH RECOVERY SOLUTIONS, LLC